# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

BENEDICT MOHIT,

    Plaintiff,

v.

Case No: 8:2020 CV 813 T 02 SPF

MORRIS WEST, Mayor, City of Haines City,
A Municipal Corporation in the State of Florida;
ANNE HUFFMAN, Vice Mayor, City of Haines City;
HORACE WEST, Commissioner, City of Haines City;
JAYNE HALL, Commissioner, City of Haines City;
ROY TYLER, Commissioner, City of Haines City;
DERIC FEACHER, City Manager, City of Haines City;
FRED REILLY, City Attorney, City of Haines City;
RICHARD GREENWOOD, Development Services Director,
City of Haines City;
MARK BENNETT, Deputy Development Services Director,
City of Haines City;
As individuals and in their personal capacity,

    Defendants.

_____/

### COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND THE CLEAN WATER ACT

    The *pro se* Plaintiff files suit against the Defendants who denies him, by the unlawful adoption and enforcement of ordinance, regulation, resolution, rule, and policy, of his vested statutory rights to conduct <u>state-regulated</u> bona fide commercial agricultural activities and farming operations on his property which is classified as agricultural lands pursuant to §193.461, Fla. Stat., thereby, violating his civil rights and the federal Clean Water Act.



1

**INTRODUCTION**

1. According to Maslow, the most basic necessities of human life are: food, water, and oxygen (*Maslow 1943*). Agriculture provides all three. In 1845, at a time when colonial plantations slowly spread throughout Florida, citrus and cattle were major economic resources for the new State. In 2017, the state's agricultural revenue totaled an impressive $132 billion while providing more than 2.2 million jobs. Florida ranked first in the U.S. in the production of oranges, grapefruit, cucumbers, squash, sugarcane, snap beans, and tomatoes. Florida has 47,000 commercial farms utilizing 9.5 million acres of land. However, all is not so rosy. In 2017, cattle totaled 1.63 million head, <u>down</u> 70,000 from 2016. Calves born during 2017 totaled 790,000 head, <u>down</u> 20,000 from 2016. A dwindling industry! (*Florida Agricultural Statistics Service*). Food security, potable water, and clean air for Floridians is in perilous danger. At the current land degradation rate, in less than 150 years from today, Florida would have no arable land left. (*www.farmlandinfo.org*). Perhaps, poor planning.

2. Recognizing these challenges, the Florida Legislature adopts laws which keep the regulation of commercial agriculture in <u>state hands</u> to protect our invaluable resources. So the Florida Legislature, by constitution and by statutes, expressly protects and preserves property rights to conduct <u>commercial</u> agricultural operations in a manner that cannot be regulated by municipalities (*pre-emption*). Furthermore, Florida Legislature declares in the cited agricultural statutes that the conduct of "*Greenbelt farming*" is expressly protected from <u>nuisance</u> suits; and that the encouragement, improvement, and preservation of *Greenbelt farming* will result in a general benefit to the health, safety, and welfare of the people of the state (including our fifth graders, children and grandchildren today, and our future generations of tomorrow, etc.). <u>Pre-emption is strong medicine</u> and so, it is not casually dispensed.

3.  As used in this lawsuit, the term "*Greenbelt farming*" means the conduct of farm operations which are implemented via rules adopted under Ch. 120, Florida Administrative Code (FAC) (*state-regulated*), and conducted on lands which are classified as agricultural lands pursuant to §193.461, Fla. Stat., (*Greenbelt Law*). Section 193.461 states: "Only lands that are used primarily for bona fide agricultural purposes shall be classified agricultural. The term 'bona fide agricultural purposes' means good faith commercial agricultural use of the land. The term "agricultural purposes" includes, but is not limited to, horticulture; floriculture; viticulture; forestry; dairy; livestock; poultry; bee; pisciculture; aquaculture; algaculture; sod farming; and all forms of farm products as defined in s. 823.14(3) and farm production." Farm, farm operation, and farm products are defined in §823.14(3), Fla. Stat., Florida Right to Farm Act.

4.  The *pro se* Plaintiff farmer filed suit against the City of Haines City in this Court alleging a taking of his property without just compensation in violation of the Fifth Amendment and of the Fourteenth Amendment to the United States Constitution, and this suit is still pending.

## JURISDICTION

5.  "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Rev. Stat. § 1979, 42 U. S. C. § 1983.

6.  The federal statutes and/or provisions of the United States Constitution that are at issue in this case are (1) Fifth Amendment, 42 U.S.C. §1983, (2) Fourteenth Amendment, (3) Fair Housing Act, 42 U.S.C. §§ 3601-3619, Title VIII of the Civil Rights Act, and (4) Clean Water Act (Federal Water Pollution Control Act).

3

## **PARTIES**

7.  The Plaintiff farmer is Benedict Mohit ("Mohit") appearing *pro se,* and his property, a farm firm, is located in the City of Haines City, Polk County, Florida.

8.  The Defendants are Morris West, Anne Huffman, Horace West, Jayne Hall, and Roy Tyler, ("Commissioners"), Commission Members of the City of Haines City; and Deric Feacher, Fred Reilly, Richard Greenwood, and Mark Bennett, ("Officials"), Officials of the City of Haines City, a Municipal Corporation in the State of Florida, located in Haines City, Polk County.

## **GENERAL ALLEGATIONS AND STATEMENT OF FACTS**

9.  In May 2012, Mohit purchased an abandoned farm and immediately implemented commercial hay farming operations on his property (Ex. 23. P. 4, 5) in accordance with state-adopted Rule 5M-8, Ch. 120, FAC. Mohit purchased the farm with the intent of conducting *Greenbelt farming* and using the profits to build and maintain a family home on his farm. Ex. A. Mohit's Declaration. The farm has been in continuous operation since 2013 and continues to be classified as agricultural lands every year up to today, in 2020. Ex. 13 – Tax receipts.

10. On January 01, 2013, as a direct result of the existing farm uses, Polk Count Property Appraiser classified Mohit's farm as agricultural lands pursuant to §193.461, Fla. Stat. Ex. 1, p. 2 - State trial court order; Ex. 20, p. 4 - Property Appraiser website property details.

11. Mohit is and has always been desirous of conducting *Greenbelt farming* including hay, livestock, apiculture (*bee*), and poultry; he wanted to **change** his farm product from hay to beef; and he always wanted to erect barb wire fences on his farm.

12. Like all farmers in Florida, Mohit has a vested statutory right via §§193.461, 163.3162 (3),
    163.3221(4b5), §163.3162 (3), 163.3194 (5), 163.3202, 163.3164(14), 166.021, 166.033(4),
    373.406(2), 380.04(3e), (3f), 586.10, 586.055, 604.001, 604.50, 823.14 (4b), (6), Fla. Stat., to
    conduct *Greenbelt farming* in a manner that cannot be regulated by a municipality; that right
    to farm was denied by the Commissioners through regulations and policy which they adopted
    that make the conduct of *Greenbelt farming* unlawful; and the adopted regulations does not
    grant an expressed exception or exemption for the conduct of *Greenbelt farming*.

13. Pursuant to Article VIII, Section 2(b), Florida Constitution; §166, Fla. Stat., the Municipal
    Home Rule Powers Act; §163, Fla. Stat., Part II, Land Development Regulation; and §380.04,
    Fla. Stat., the Commissioners and Officials lack municipal home rule powers to govern lands
    used primarily for agricultural purposes because *Greenbelt farming* is one of eight activities
    expressly excluded from the statutory definition of "*development*" as the term applies to the
    "development of land," "land development regulations" and to a "development permit or
    order."

14. Section 166.033, Fla. Stat., Development permits and orders: states, "(4) As used in this
    section, the terms "development permit" and "development order" have the same meaning as
    in s. 163.3164, but do not include building permits." Section 163.3164, Fla. Stat., Community
    Planning Act; definitions: states, "(14) "Development" has the same meaning as in s. 380.04.
    (15) "Development order" means any order granting, denying, or granting with conditions an
    application for a development permit. (16) "Development permit" includes any building
    permit, zoning permit, subdivision approval, rezoning, certification, special exception,
    variance, or any other official action of local government having the effect of permitting the
    development of land." Section 380.04, Fla. Stat., Definition of development: states, "(3) The

following operations or uses **shall not** be taken for the purpose of this chapter to involve "development" as defined in this section: (e) The use of any land for the purpose of growing plants, crops, trees, and other agricultural or forestry products; raising livestock; or for other agricultural purposes."

15. Florida Statutes, §§163.3162 and 823.14, expressly prohibits a municipality from using any of its powers to adopt or enforce any ordinance, regulation, resolution, rule, or policy to prohibit, restrict, regulate, or otherwise limit the conduct of state-regulated farm operations on lands classified as agricultural lands pursuant to §193.461, Fla. Stat. - *Greenbelt farming*.

16. In 2014 City Attorney, Mr. Fred Reilly, affirmed in his state trial pleadings that: "CITY readily acknowledges that Section 163.3162(3) (Duplication of Regulation) provides the express limitation that 'A local governmental entity may not exercise any of its powers to **adopt or enforce** any ordinance, resolution, regulation, rule, or policy to prohibit, restrict, or regulate, or otherwise limit an activity of a bona fide farm operation on lands classified as agricultural lands pursuant to s. 193.461.'" Emphasis in original. Ex. 4, p. 3.

17. On November 30, 2015, the Florida trial court finds that: "Pursuant to §823.14 and §163.3162, Fla. Stat.,.... local governments may not adopt any ordinance, regulation, rule, or policy to prohibit, restrict, regulate, or otherwise limit an activity of a bona fide farm operation on land classified as agricultural where such activity is regulated through implemented best management practices developed by the Department of Agriculture, and adopted as a rule under Chapter 120, FAC." Ex. 1, p. 2.

18. Florida legislature finds in §§823.14, 163.3162, 193.461, and 604.001, Fla. Stat., that: "Agricultural lands constitute unique and irreplaceable resources of statewide importance; and that the encouragement, development, improvement, and preservation of agriculture will result

6

in a general benefit to the health, safety, and welfare of the people of the state;" and in §823.14, Fla. Stat., Florida Right to Farm Act, Florida Legislative Findings and Purpose -- states that, "It is the purpose of this act to protect reasonable agricultural activities conducted on farm land from nuisance suits."

19. Numerous farm operations are regulated by rules adopted under Ch. 120, Florida Administrative Code (FAC), including Florida Cattle (*cows/calf*) Operations by Rule 5M-11; Florida Vegetable and Agronomic Crops (*hay*) by Rule 5M-8; Apiculture (*bees*) by Rule 5B-54.0105; Florida Poultry (*chickens*) by Rule 5M-19; Florida Citrus by Rule 5M-16 and Rule 5M-5; Florida Equine (*horses*) Operations by Rule 5M-14; Florida Dairies (*cows*) by Rule 5M-17; Aquaculture (*fish*) by Rule 5L-3.004, and Florida Silviculture (*forestry*) by Rule 5I-6; Ex. 2, Ex. 2a. Many agricultural operations are regulated by rules and codes adopted by the USEPA and the USDA. Ex. 3, Ex 3a.

20. From 2012 through 2020 on a continuing basis, the Commissioners purposely adopted and enforces ordinances, regulations, resolutions, rules, and policies which prohibit, restrict, regulate, and otherwise limit the conduct of all agricultural activities in the R-2 zoned residential district, including Mohit's existing and proposed *Greenbelt farming* operations.

21. From 2010 to 2020, the Commissioners and Officials knew the meaning of the cited agricultural statutes and the supporting case law on *Greenbelt farming*, and they failed to amend or change the existing land development regulations to exempt *Greenbelt farming* from the stipulated prohibition and restrictions; and they knew the LDR did not comply with several state laws. Ex. 8, p. 27, 28, 29 – State Court Transcript.

22. The Commissioners and the Officials purposely adopted and enforces LDR which prohibit restrict, and limit the conduct of *Greenbelt farming* to oppress such farm operations to gain

astronomically higher tax revenues for houses than that obtained from farming. Mohit's farm was designed for constructing 100 homes and perhaps the City would obtain close to $500,000 in tax revenues compared to $100 from Mohit's farm, a 5,000 fold increase.

23. The City Commission of Haines City is the elected legislative and governing body of the City. The duties and policies of the Commissioners include: Adopting local laws and ordinances; Appointing the City Manager, City Attorney and City Clerk; Establishing policies, assessments and other fees; Managing growth and land use; and Setting the annual tax rate. Haines City Website. https://hainescity.com/225/City-Commission

24. The duties of the Officials include: Planning and Zoning, Land Development, Permitting and Licensing, and Community Redevelopment; Legal and regulatory matters, code enforcement compliance; Drafting and reviews of ordinances and resolutions; Prosecutes violations of the City Code of Ordinances and Land Development Regulations. Haines City Website.

25. Chapter 163, Florida Statutes, empowers the City Commission to prepare and enforce Land Development Regulations for the implementation of the adopted City's Comprehensive Plan. (Ex. 16, p. 27.). The Land Development Regulations are enacted pursuant to the requirements and authority of F.S. § 163.3202, the general powers for municipal corporations in F.S. Ch. 166 and the City Charter. Ex. 16, p. 49 – Haines City Land Development Regulations (LDR).

26. Ch. 166 Fla. Stat., shall be known and may be cited as the "Municipal Home Rule Powers Act." Section 166.021, Fla. Stat., Powers: states that municipalities shall have the governmental powers to conduct municipal government and may exercise any power for municipal purposes, except when expressly prohibited by law.

27. Florida Constitution, Article VIII, Section 2 (b) states: "Municipalities shall have governmental, corporate and proprietary powers to enable them to conduct municipal

government, perform municipal functions and render municipal services, and may exercise any power for municipal purposes except as otherwise provided by law."

28. The intent and purpose of the LDR is to: Promote and protect the public health, safety, and general welfare of the residents and property owners of the city; Implement the adopted comprehensive plan through a set of specific and detailed land development provisions; Combine various types of city regulations and laws dealing with the development of land into one comprehensive land development regulation; Guide the future growth, development, and redevelopment of the city; Maintain and improve the quality of life in the city; Establish a development review process to ensure compliance with these regulations and consistency with the comprehensive plan. Ex. 16, p. 53.

29. The provisions of the LDR shall apply to all development activity within the corporate limits of the City of Haines City, Florida; and no development activity, as defined in the regulations, shall be undertaken without prior authorization pursuant to these regulations. Ex. 16, p. 57.

30. The LDR defines *development* as: "Any man-made change to improved or unimproved real estate, including but not limited to, buildings or other structures, tanks, temporary structures, temporary or permanent storage of equipment or materials, mining, dredging, filling, grading, paving, excavations, drilling operations or any other land disturbing activities." Ex. 16, p. 70. Neither this definition of *development* nor the adopted LDR create an exception or exemption for the conduct of *Greenbelt farming* operations.

31. The LDR adopted by the Commissioners and City Attorney, and drafted by the Officials, in Sec. 5-2 makes it unlawful to keep any animal within the City (Ex. 12). Sec. 5.6.3 (B) specifies the permitted uses in the R-2 district as: single family dwellings, public recreational facilities, schools and colleges, houses of worship, and cemeteries. Ex. 16, p.168. Sec. 5.6.3 (D4)

prohibits any use not specifically included in Sec. 5.6.3 (B) Ex. 16, p. 170. The LDR does not expressly grant an exception or exemption for the conduct of any bona fide commercial agricultural purposes in the R-2 district even when such agricultural purposes are implemented via state-adopted BMP rules or via federal rules and codes on *Greenbelt* lands.

32. Sec. 5.6.3 (E) of the LDR requires a "conditional use development permit" permissible by the "City Commission" for the conduct of four specific agricultural purposes namely: (a) citrus, (b) horticulture, (c) forestry, and (d) grazing, pasture and growing hay Ex. 16, p. 170. These four farm uses or operations are each regulated by a Rule adopted under Ch. 120, FAC, namely: (a) citrus by Rule 5M-16, (b) horticulture by Rule 5M-6, (c) forestry by Rule 5I-6, and (d) livestock grazing by Rule 5M-11; hay by 5M-8. Ex. 2, Ex. 2a.

33. On August 06, 2015, the Commissioners adopted Resolution No. 15-1153, a conditional use *development* permit for Mohit to conduct specific farm operations with provisions: (a) restricting to a maximum, twenty cattle or five horses; (b) the express prohibition of swine (*pigs*) production; and (c) limiting all agricultural purposes to ten years. Ex. 9.

34. Since 2014, the Commissioners, Officials, and the City Attorney, Mr. Fred Reilly, knew that the adopted LDR and Resolutions on *Greenbelt farming*, conflict with and stand as an obstacle to the full purpose and intent of several agricultural state laws because Mohit and the Polk County Property Appraiser brought it to their notice via a report on Florida agricultural statutes and case laws, Ex. 6 - Property Appraiser Agricultural Classification Guidelines; and Mohit wrote at the top of the permit application that it was in violation of state law. Ex. 7

35. The Commissioners and Officials alleged misconduct of adopting the challenged LDR and Resolution No. 15-1153, prohibits Mohit from keeping more than six (6) horses on his farm even though he will implement equine operations via Rule 5M-14, Ch. 120, FAC.

36. Mohit's neighbor, Mr. Grullon's property consists of 17.7 acres of pasture (Ex. 19, p. 4 - Property Appraiser's Website), and it is <u>similarly situated</u> to Mohit's property which consists of 18.3 acres of pasture (Ex. 20, p. 4). Mohit's pasture land is slightly <u>larger</u> than the comparator - Grullon's pasture land. Grullon stated on his permit application (Ex. 10) that he plans to keep 100 goats and cattle on his property. The Commissioners and Mr. Reilly by adopting Resolution No. 12-1009 (Ex. 11), permits Grullon to keep an <u>unlimited</u> number of animals and of <u>any species</u> on his farm. The Commissioners and Mr. Reilly by adopting Resolution No. 15-1153 (Ex. 9), limits Mohit to keeping 20 cows or 5 horses, and restricts the species of animals to cows, goats and horses.

37. Mr. Fred Reilly, City Attorney, <u>approved</u> and <u>executed</u> both land development permits for Mohit, Resolution No. 15-1153, Ex. 9, and for the comparator, Mr. Grullon, Resolution No. 12-1009, Ex. 11.

38. "Although municipalities generally have "the power to enact legislation concerning any subject matter upon which the state Legislature may act," § 166.021(3), Fla. Stat. (2004), in exercising their power within that scope municipalities are precluded from taking any action that conflicts with a state statute. In this context, <u>concurrent power does not mean equal power</u>." *City of Palm Bay v. Wells Fargo Bank, NA*, 114 So. 3d 924 (Fla. 2013).

39. "[I]n order for a municipality's ordinance to prohibit a use which is allowed by the general laws of the state, there must be an express legislative grant by the state to the municipality authorizing such prohibition." *Rinzler v. Carson,* 262 So.2d 661 (Fla. 1972).

40. Florida Appeal Court finds that, "[T]he Right to Farm Act provisions <u>restricting local government from adopting ordinances restricting farming activities</u> became effective on June 16, <u>2000</u>." *Wilson v. Palm Beach County*, 62 So. 3d 1247 (Fla. Dist. Ct. App. 2011).

41. Florida Appeal Court finds: "The plain, unambiguous terms of section 163.3162(3), Florida Statutes, prevent counties from *adopting* ordinances relating to agriculture. A statute must be given its plain and obvious meaning (*citing*) *McLaughlin v. State,* 721 So.2d 1170, 1172 (Fla.1998)." *J-II INVESTMENTS, INC. v. Leon County*, 908 So. 2d 1140 (Fla. Dist. Ct. App. 2005).

## COUNT I: <u>VIOLATION OF DUE PROCESS</u>

42. Mohit re-alleges the allegations of paragraphs 1 through 41 and further alleges:

43. During 2012 to 2020, the Commissioners, City Attorney, and Officials <u>adopted</u> LDR prohibiting the conduct of all agricultural activities, including *Greenbelt farming*, in its R-2 zoned residential district. The LDR makes Mohit's existing and proposed <u>state-regulated</u> commercial farm operations on his *Greenbelt* lands, an illegal use. The challenged sections of the LDR (1) conflicts with and stands as an obstacle to the purpose and intent of several agricultural state laws. (2) The LDR, without an expressed exemption for *Greenbelt farming*, is unreasonable, arbitrary, capricious, and they have no rational basis because they are alleged to be unlawful. (3) The challenged sections of the LDR does not result in a general benefit to the health, safety, and welfare of the residents of the city because the expressed purpose of several cited statutes (§§163.3162, 823.14, and 604.001, Fla. Stat.) in protecting and preserving (pre-empting) *Greenbelt farming* is to promote the health, safety, and welfare of the people of the state, including the residents of the city. (4) Contrary to the intent of §604.001, Fla. Stat., the challenged sections of the LDR makes farm production inefficient and unprofitable. (5) The LDR was intentionally disparately applied to the Mohit's agricultural lands compared to one similar neighboring agricultural lands, Grullon's, thereby, depriving Mohit of productive

and economic use of his commercial farm without due process of the law afforded under the Fifth and Fourteenth Amendments to the U. S. Constitution.

44. On July 31, 2010, <u>The Ledger</u> published: "Polk County Property Appraiser's decision to classify certain residential zoned lands as agriculture according to §193.461, surprised officials in cities whose revenue was being affected by reduced taxes. In response, Mr. Richard Greenwood, Community Development Director said '<u>that's ridiculous</u>.'"

45. On July 01, 2014, Mohit met with Officials Bennett and Greenwood (who left after awhile) regarding <u>changing</u> his existing hay crop to state-regulated livestock operations; the Officials threatened Mohit with daily fines, a lien on his property, and to shut his farm down if he continued agricultural activities or if he was to keep any animals on his farm without a land <u>development</u> permit; the Officials stated that agriculture was not a permitted use in the R-2 zoned residential district in which the property is located, and that the conduct of any agricultural purpose by Mohit would be <u>unlawful</u>.

46. Official Bennett insisted that Mohit must apply for a <u>development</u> permit which he did under protest, bringing to Bennett's attention Polk County Property Appraiser's Report (Ex. 6), including its cited case law on agricultural classification. Mohit <u>wrote at the top of the application that the permit requirement for his proposed farm activities is in violation of state law</u>. Official Bennett stated that the City has a "charter ordinance" and therefore, does not have to comply with the agricultural statutes or case law cited by the Property Appraiser, and that the City can adopt and enforce "stricter" provisions for farm operations than state law. Official Bennett insisted that Mohit must list the type and number of animals on his application, keeping the numbers low, for a farmer like him to have any chance of an approval, and that he can keep only one type of animal at a time but he may rotate them, and he must state that he

will not keep any pigs. Official Bennett stated that Mohit's proposed farm fence requires a permit and its fee, and the farm fence would have to meet the residential fence setback of 25 feet like Grullon's farm. Ex. 11

47. On December 04, 2014, City Attorney, Mr. Fred Reilly, plead that the City readily acknowledges that Section 163.3162(3) (Duplication of Regulation) provides the express limitation that: A local governmental entity may not exercise any of its powers to **adopt or enforce** any ordinance, resolution, regulation, rule, or policy to prohibit, restrict, or regulate, or otherwise limit the conduct of *Greenbelt farm* operations. Emphasis in original. Ex. 4, p. 3 – Haines City State court pleading.

48. The challenged sections of the LDR prohibit all agricultural activities irrespective of whether farm operations are being implemented via state-adopted-BMP rules, and regardless of whether the property is classified as agricultural lands pursuant to §193.461, Fla. Stat.

49. Section 163.3162(3), Fla. Stat., states that: "A governmental entity may not exercise any of its powers to adopt or enforce any ordinance, regulation, *resolution*, rule, or policy to prohibit, restrict, regulate, or otherwise limit an activity of a bona fide farm operation on land classified as agricultural land pursuant to s.193.461, if such activity is regulated through implemented best management practices, adopted as rules under chapter 120,....or if such activity is expressly regulated by the USDA or USEPA."

50. The Commissioners and Officials adopts LDR pursuant to the Municipal Home Rule Powers Act - Ch.166 and Ch. 163, Fla. Stat., Part II, Land Development Regulation. But Ch.166 and Ch. 163 states that lands used primarily for farming is one of eight activities expressly excluded from the statutory definition of "*development*" as the term applies to the "development of land," "land development regulations" and to a "development permit or order."

51. On October 20, 2015, the City Attorney admitted that the LDR needed to be revised to "have those agricultural exceptions of Chapter 120, FAC, folded into the regulations" in order for the LDR to comply with §§823.14 and 163.3162, Fla. Stat. Ex. 8, p. 27, 28, 29 – State Court Transcript.

52. The Commissioners and Officials adopts and enforces LDR which prohibits farmers, including Mohit, from erecting farm buildings and fences without a development permit allegedly in violation of §604.50, Fla. Stat., which expressly exempt any nonresidential farm building, farm fence, or farm sign that is located on lands used for bona fide agricultural purposes from the Florida Building Code and from any county or municipal code or fee.

53. The Commissioners and Officials adopts and enforces tax assessments for stormwater on Mohit's *Greenbelt* farm allegedly in violation of §163.3162(3)(c), Fla. Stat., which expressly prohibits a governmental entity from charging an assessment or fee for stormwater management on a bona fide farm operation on land classified as agricultural land pursuant to s. 193.461, if the farm operation implements best management practices adopted as rules under chapter 120, FAC. Ex. 20, p. 5 – Property Appraiser website showing annual assessment.

54. The Commissioners and Officials adopts and enforces LDR which prohibits farmers, including Mohit, from conducting apiculture on their *Greenbelt* lands allegedly in violation of §586.10 (1), Fla. Stat., which states: "Powers and duties of department; Preemption of local government ordinances: The authority to regulate, inspect, and permit managed honeybee colonies and to adopt rules on the placement and location of registered inspected managed honeybee colonies is preempted to the state through the department and supersedes any related ordinance adopted by a county, municipality, or political subdivision thereof." Section 586.055, Fla. Stat., states:

"Location of apiaries: -: An <u>apiary</u> may be located on lands classified as agricultural under s.193.461, Fla. Stat."

55. Mohit's neighbor, Mr. Grullon's property consists of 17.7 acres of pasture (Ex. 19, p. 4 - Property Appraiser's Website), and it is <u>similarly situated</u> to Mohit's property which consists of 18.3 acres of pasture (Ex. 20, p. 4). Mohit's pasture land is slightly <u>larger</u> than the comparator - Grullon's pasture land. Mr. Grullon's stated on his permit application (Ex. 10) that he plans to keep 100 goats and cattle on his property.

56. The Commissioners and City Attorney, by adopting Resolution No. 12-1009 (Ex. 11), permits Mr. Grullon to keep an <u>unlimited</u> number of animals and of <u>any species</u> on his property. In contrast, the Commissioners and City Attorney, by Resolution No. 15-1153 (Ex. 9), allows Mohit to keep 20 cows or 5 horses and no other <u>species</u> on his property except 20 goats.

57. Mohit believes that the restrictive provisions of Resolution No. 15-1153 were adopted disparately and are being enforced on his existing and proposed farming operations because of his physical attributes, including dark color of his skin, foreign language accent, and his foreign origin.

58. For these reasons, Mohit seeks, in part, refund for all stormwater assessment, compensation for loss of farm revenues and compensation for due process of the law.

### COUNT II: <u>VIOLATION OF EQUAL PROTECTION OF THE LAW</u>

59. Mohit re-alleges the allegations of paragraphs 1 through 41 and further alleges:

60. Mohit brings Count II against the Commissioners and Officials for <u>enforcing</u> alleged unlawfully adopted LDR and Resolution No. 15-1153 during 2014 to 2020 which prohibit, restrict, and limit his existing and proposed *Greenbelt farm* operations.

61. On August 06, 2015, the City adopted <u>Resolution</u> No. 15-1153, a conditional use *development* permit for Mohit to conduct specific farm operations on his farm with provisions: (a) <u>restricting</u> to a maximum, twenty cattle <u>or</u> five horses; (b) the express <u>prohibition</u> of swine (*pigs*) production; and (c) <u>limiting</u> all agricultural purposes to <u>ten years</u>. Ex. 9.

62. Section 163.3162 (3), Fla. Stat., states that: A governmental entity may not exercise any of its powers to <u>adopt or enforce</u> any ordinance, regulation, ***resolution*** , rule, or policy to <u>prohibit</u>, <u>restrict</u>, regulate, or otherwise <u>limit</u> an activity of a bona fide farm operation on land classified as agricultural land pursuant to s.193.461....

63. Pursuant to the Municipal Home Rule Powers Act and Ch. 163, Fla. Stat., Part II, Land Development Regulation, the Commissioners and Officials lack municipal home rule powers to govern Mohit's conduct of *Greenbelt farming* because it is <u>one of eight activities</u> expressly excluded from the statutory definition of "*development*" as the term applies to the "development of land," "land development regulations" and to a "development permit or order."

64. Mohit believes that the alleged unlawful adoption and enforcement of the LDR and <u>Resolution</u> No. 15-1153 on his existing and proposed *Greenbelt farming* was intentionally disparately applied to his agricultural lands compared to that of similarly situated Grullon's lands.

65. The alleged misconduct of the Commissioners and Officials deprived Mohit of his vested state-created right to farm without equal protection of the law afforded under the Fifth and Fourteenth Amendments to the U. S. Constitution for which he seeks compensation for loss of farm revenues loss of income, loss of profits, and other economic losses.

### COUNT III: <u>VIOLATION OF FEDERAL CLEAN WATER ACT</u>

66. Mohit re-alleges the allegations of paragraphs 1 through 41 and further alleges:

67. Count III alleges violations under the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"). Under the CWA, the State of Florida is given the authority to regulate agricultural nonpoint pollution sources (NPS) through best management practices (BMPs), which are soil and water conservation practices, other management techniques, and social actions that are developed as effective and practical tools for environmental protection. Agricultural BMPs are established to decrease the nutrient impairment of our water resources while allowing agriculture to remain economically viable. Florida BMPs are adopted as rules under Ch. 120, FAC, for most farm products and commodities. Ex. 2, 2a.

68. From 2012 to 2020, Defendants prohibited Mohit's existing and proposed implementation of state-adopted agricultural BMP rules for water quality and water conservation on his *Greenbelt* farm. Defendants' actions stand as an obstacle to the purpose of the CWA resulting in potential detrimental effects on and pose an ongoing threat to the surface water run-off from Mohit's farm due to soil erosion, herbicides, pesticides, fertilizer, animal waste, and other pollutants including, nitrogen, phosphorus, suspended solids, bacteria, and pharmaceuticals.

69. Mohit's farm was classified as agricultural lands pursuant to §193.461, Fla. Stat., on January 01, 2013. Ex. 1, p. 2. The farm has been in continuous operation since 2013 and continues to be classified as agricultural lands every year up to today, in 2020. All existing and proposed farm operations conform to generally accepted agricultural and management practices.

70. Mohit always wanted to change his implemented state-regulated Rule 5M-8 hay crop to incorporate and implement state-regulated BMP-rule operations including Rule 5M-11 livestock, Rule 5B-54 apiculture, Rule 5I-6 forestry, and Rule 5M-19 poultry, etc.

71. The City admits in the state trial that Mohit's farm was not a nuisance at the time of its established date of operation nor at any time thereafter.

72. Implementing and maintaining state-adopted agricultural BMPs provides a presumption of compliance with state water quality standards for the pollutants addressed by the BMPs. The Florida Right to Farm Act prohibits local governments from regulating an agricultural activity related to water quality where BMPs are in place.

https://www.fdacs.gov/Agriculture-Industry/Water/Agricultural-Best-Management-Practices

73. Florida Right to Farm Act, §823.14 (4b), Fla. Stat., states: No farm operation shall become a public or private nuisance as a result of a change in the type of farm product being produced, or a change brought about to comply with Best Management Practices adopted by local, state, or federal agencies if such farm has been in operation for 1 year or more since its established date of operation and if it was not a nuisance at the time of its established date of operation.

74. In 1972, Congress enacted the CWA in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

75. CWA section 402(b), 33 U.S.C. § 1342(b), gives the USEPA Administrator authority to allow Florida to administer its own NPDES program. In Florida, the USEPA has delegated authority to Department of Environmental Protection (FDEP) to issue NPDES permits or to exempt certain uses from the requirement for a permit. The USEPA regulates swine production by EPA 833-F-02-006; chicken and turkey by EPA 833-F-02-008; dairy cow and heifer by EPA 833-F-02-009; beef cattle and veal calf by EPA 833-F-02-0010.

76. FDEP adopted Rule 62-670 and Rule 62-620 (3), Ch. 120, FAC, which by reference (r), (s), (t), (u), (v), and (w) adopts the respective USEPA regulation on chicken and turkey, dairy cow and heifer, beef cattle and veal calf, etc.

77. The U.S. Congress delegated authority to the USDA to regulate animals, plants, and other agricultural products. Agricultural activities regulated by the USDA are listed in the Code of

Federal Regulations, Part 1, Title 7, Agriculture; and Part 1, Title 9, Animals and Animal Products. The USDA has specific on-farm conservation practice codes frequently called "best management practices." The USDA regulates Grazing of animals by Code 528; Livestock shelter by Code 576 (*animal housing*); Cropping, forage, **hay**, and horticulture by Code 311; Trees, shrubs, horticulture by Code 612; Forage Harvest Management by Code 511; Forage, **hay**, and pasture by Code 512; Crop rotation by Code 328; Forestry by Code 666; Aquaculture by Code 397; Fence by Code 382 (*see §604.50, Fla. Stat., fences are exempted from local codes and fees);* Land Clearing by Code 460; Water Well by Code 642. The USDA authority for regulating on-farm agricultural activities is derived, in part, from the Animal Health Protection Act, the Plant Protection Act, the Farm Bill, and the Agricultural Marketing Act.

78. As a direct and proximate result of Defendants' wanton or reckless conduct, Mohit has suffered injury and damages for which Defendants are liable, including but not limited to, loss of income, loss of profits, and other economic losses.

## COUNT IV: PUNITIVE DAMAGES FOR VIOLATING FLORIDA CONSTITUTION AND STATUTES

79. Mohit re-alleges paragraphs 1 through 78 of this Complaint and further alleges:

80. The Commissioners and Officials, like all persons in the state, must comply with Florida Constitution and Florida Statutes. Statutes come clothed with a presumption of constitutionality and must be construed whenever possible to effect a constitutional outcome. Should any doubt exist that an action is in violation of any constitutional provision, the presumption is in favor of constitutionality. To overcome the presumption, the invalidity must appear beyond reasonable doubt, for it must be assumed the legislature intended to enact a valid law. Preemption fundamentally is a question of legislative intent, and when the

Legislature has made its intent known through explicit statutory language, the Court's task becomes an easy one.

81. Pursuant to municipal home rule powers granted under Ch. 163 and Ch. 166, Fla. Stat., the Commissioners and Officials adopted LDR which prohibit the conduct of all *Greenbelt farming* within the city without a development permit, and the LDR does not exempt the conduct of *Greenbelt farming* for any property owner or farmer, including Mohit.

82. The Commissioners and Officials Riley and Bennett adopted <u>Resolution</u> No. 15-1153, a land <u>development permit or order</u> for Mohit's existing and proposed *Greenbelt farming* with provisions: (a) <u>restricting</u> to a maximum, twenty cattle <u>or</u> five horses; (b) the <u>prohibition</u> of swine (*pigs*) production; and (c) <u>limiting</u> all agricultural purposes to <u>ten years</u>. Ex. 9.

83. Pursuant to Ch. 163 and 166, Fla. Stat., the Commissioners and Officials may adopt LDR prohibiting *backyard and subsistence agriculture,* and where appropriate, permitting such activities with restrictions and limitations, even if they are not a nuisance, and when conducted on lands which are not primarily used for commercial farming. But, Concurrent Power Does Not Mean Equal Power.

84. Pursuant to Ch. 163 and Ch. 166, Fla. Stat., by definition, the conduct of *Greenbelt farming* is not "land development" or "development of land" and therefore, *Greenbelt farming* is beyond the reach of the adopted land development regulations which are alleged to prohibit, restrict, regulate, or otherwise limit *Greenbelt farming* within the city.

85. The Commissioners and Officials ignored or failed to comply with numerous state laws governing the conduct of *Greenbelt farming* including §§193.461, 163.3162 (3), 163.3221(4b5), §163.3162 (3), 163.3194 (5), 163.3202, 163.3164(14), 166.021, 166.033(4), 373.406(2), 380.04(3e), (3f), 586.10, 586.055, 604.001, 604.50, 823.14 (4b), (6), Fla. Stat.

86. The Commissioners and Officials ignored or failed to comply with Article VIII, Section 2(b), Florida Constitution and with §166.021, Fla. Stat., the Municipal Home Rule Powers Act which makes it unlawful for a municipality to violate general state laws.

87. Since Florida legislature finds in §§823.14, 163.3162, 193.461, and 604.001, Fla. Stat., that: "Agricultural production is a major contributor to the economy of the state; agricultural lands constitute unique and irreplaceable resources of statewide importance; and that the encouragement, development, improvement, and preservation of agriculture will result in a general benefit to the health, safety, and welfare of the people of the state;" then the Commissioners alleged prohibition of Mohit's proposed *Greenbelt farming* is a reckless disregard for the health, safety, and welfare of the residents of their city and of the citizens of the state of Florida.

88. The foregoing allegations demonstrate wanton, reckless, and grossly negligent conduct, and such alleged unlawful misconduct by the Commissioners and Officials warrant punitive damages such that future parties are dissuaded from engaging in the same or similar wanton, reckless, and grossly negligent conduct. Accordingly, Mohit is entitled to an award of punitive damages in an amount to be determined at trial.

## COUNT V: PUNITIVE DAMAGES FOR VIOLATING FEDERAL LAW

89. Mohit re-alleges paragraphs 1 through 78 of this Complaint and further alleges:

90. The Commissioners and Officials adopted and enforces LDR which are alleged to stand as an obstacle to the purpose and intent of numerous state laws, the federal CWA, Animal Health Protection Act, Plant Protection Act, Agricultural Marketing Act, Farm Bill, and the U.S. Constitution – Due process and Equal Protection of the Law.

91. Pursuant to Ch. 163 and Ch. 166, Fla. Stat., by definition, the conduct of *Greenbelt farming* is not "land development" or "development of land" and therefore, *Greenbelt farming* is beyond the reach of the adopted land development regulations which are alleged to prohibit, restrict, regulate, or otherwise limit *Greenbelt farming*.

92. From May 2012 to April 2020, the Defendants, via the adoption and enforcement of LDR, Resolution No. 15-1153, and policy, prohibited Mohit's conduct of his existing and proposed *Greenbelt farming*, thus, denying him of all economically beneficial and productive use of his property and depriving him of all farm revenues, thereby rendering his farm worthless.

93. Defendants' alleged misconduct injures every resident within the city - residents which the Defendants are directly responsible for protecting. Their actions injure every citizen of Florida, including our children and grandchildren, and future generations. Pursuant to §§163.3162 and 823.14, Fla. Stat., "Agricultural lands constitute unique and irreplaceable resources of statewide importance.... the encouragement, improvement, and preservation of agriculture will result in a general benefit to the health, safety, and welfare of the people of the state."

94. Due to the wanton, reckless, and grossly negligent conduct of the Defendants, Mohit and the people of Florida suffered irreparable harm, the extent of which can only be demonstrated through an award of punitive damages to be determined at trial.

## COUNT VI: FAIR HOUSING ACT CLAIM

95. Mohit re-alleges the allegations of paragraphs 1 through 41 and further alleges:

96. Mohit believes that the Defendants enforced LDR and adopted Resolution No. 15-1153 with ongoing and continuous provisions restrict and limit his existing and proposed state-regulated farm operations on his *Greenbelt* farm because of his race, dark skin color, and foreign national origin and accent, thereby reducing his farm production and revenues, and with the 10-year

limit provision the Defendants prevents the construction of his family home on his vacant *Greenbelt* lands in violation of the Federal Fair Housing Act, 42 U.S.C., Sections 3601-3619, Title VIII of the Civil Rights Act.

97. Mohit belongs to the protected classes of the Fair Housing Act by virtue of his race, color and national origin; his skin is dark in color, he speaks with a foreign accent, and he is originally from the Caribbean; and he believes that the alleged discriminatory misconduct by the Defendants was solely because of these virtues of his.

98. Mohit believes that because of his race and national origin, the Commissioners on August 30, 2018, caused him to be served with a notice for being in violation of the LDR, finding that his state-regulated hay crop was in excess of the stipulated 12 inches in height. Mohit alleges that the "12 inches height" conflicts with §§823.14 and 163.3162, Fla. Stat.

99. Mohit believes that because of his race and national origin, the Commissioners on November 1, 2018, caused him to be assessed a of $53.00 stormwater management fee. Mohit alleges the assessment violates §§163.3162(3c), Fla. Stat. Ex. 20, p. 5

100.  Mohit believes that the City's regulations are colorblind but the application of the LDR by Officials Bennett, Greenwood, and Reilly to Mohit's *Greenbelt farming* are not. The federal court states that, "Farming is a hard way to make a living. Small farmers operate at the whim of conditions completely beyond their control; weather conditions from year to year and marketable prices of crops to a large extent determine whether an individual farmer will make a profit, barely break even or lose money. The farms of many African American farmers were foreclosed upon, and they were forced out of farming. Those who managed to stay in farming often were subject to humiliation and degradation at the hands of the county commissioners and were forced to stand by powerless, as white farmers received preferential treatment. As

one of plaintiffs' lawyers, Mr. J. L. Chestnut, aptly put it, African American farmers "learned the hard way that though the <u>rules and the law may be colorblind, people are not</u>,"" *Pigford v. Glickman*, 206 F.3d 1212 (D.C. Cir. 2000).

101.    Mohit believes that since July 2014, Officials Bennett, Greenwood, and Reilly harbored a discriminatory intent against him like those municipal officials did in *Pigford*. Bennett, and Greenwood threatened to shut his farm down unless he complied with the ordinance, and they stated that <u>farmers like him</u>, implying due to his dark skin color and foreign accent, would have their permit denied unless they specify a *reasonable number* of each livestock species on their application. Bennett, Greenwood, and Reilly knew that the permit requirement conflicted with Florida statutes because Mohit wrote it at the top of the permit application. Ex. 7.

102.    Mohit timely filed his complaint with Florida Commission on Human Relations. The Commission timely converted his complaint with the U.S. Department of Housing on August 26, 2016. Mohit periodically contacted the Department and was told his complaint was pending. On August 2, 2018, the City Attorney wrote to the Department stating that he had not been informed of their decision.

### RELIEF

WHEREFORE, the Plaintiff seeks judgment for (1) economic and compensatory damages, (2) mental pain, anguish, and suffering damages, (3) punitive damages, (4) costs, and (5) any other and further relief  this honorable Court deems just and appropriate.

*Benedict Mohit*

Benedict Mohit, *Pro Se*,
Clermont, Fl. 34714.
Tel: 407-579-8337. Email: fcah2006@gmail.com